

NUMBER 13-08-00218-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **BEVERLY ST. CLAIR,** | **Appellant,** |
| **v.** | |
| **MATTHEW T. ALEXANDER, M.D.**<br>**AND NEUROSURGERY INSTITUTE**<br>**OF SOUTH TEXAS, P.A.,** | **Appellees.** |

**On appeal from the 105th District Court of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides**
**Memorandum Opinion by Chief Justice Valdez**

In this medical malpractice case, appellant, Beverly St. Clair, argues that the trial court erred in sustaining objections to exclude the testimony of her expert witness, and subsequently granting summary judgment for appellees, Matthew T. Alexander, M.D., and Neurosurgery Institute of South Texas, P.A. (collectively referred to as "Alexander"). In three issues, St. Clair contends that: (1) the trial court erred by considering evidence attached by Alexander to his no-evidence motion for summary judgment; (2) this error affects the standard of review under which we should review the no-evidence summary judgment; and (3) Alexander did not properly challenge St. Clair's expert testimony because Alexander focused on the expert's conclusions rather than offering contrary

evidence to disprove the expert's methodology. We reverse and remand.

## I. BACKGROUND

In 2004, St. Clair was diagnosed with spinal stenosis, a degenerative narrowing of the spinal canal. Alexander performed an L2 inferior to S1 superior decompressive laminectomy to relieve pressure on the nerves inside St. Clair's spinal cord. After surgery, St. Clair developed cauda equina syndrome, a disorder affecting the bundle of nerve roots at the lower end of the spinal cord. As a result, St. Clair now suffers from bowel and bladder dysfunction, sexual dysfunction, and diminished ability to use her left leg.

On August 14, 2006, St. Clair brought medical negligence claims against Alexander. Alexander subsequently filed a motion for summary judgment. The motion raised no-evidence points, as well as a *Daubert-Robinson* challenge contesting the qualifications and reliability of St. Clair's expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). Alexander attached excerpts of the deposition of St. Clair's expert, J. Martin Barrash, M.D., to the motion. St. Clair filed a response and attached an affidavit by Barrash, as well as excerpts from his deposition.[1]

Alexander filed objections asserting that Barrash's testimony regarding the breach of the standard of care and causation did not meet the requirements of rule 702 of the Texas Rules of Evidence.[2] Alexander did not attach any evidence to his objections; instead, he referred to the excerpts he had attached to his no-evidence motion for summary judgment. Neither party requested a *Daubert-Robinson* hearing.

At the hearing on Alexander's no-evidence motion for summary judgment, Alexander informed the court that this was a "sort of combination motion[ ]" because it

---

[1] While some of the excerpts attached by St. Clair mirror those attached by Alexander, others do not. St. Clair attached pages 2-5, 54-77, and 110-112, while Alexander attached pages 18-25, 34-41, 46-49, 54-73, 78-93, and 102-109.

[2] Rule 702 contains three requirements for the admission of expert testimony: (1) the witness must be qualified; (2) the proposed testimony must be scientific knowledge; and (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. *See* TEX. R. EVID. 702; *E.I. du Pont Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).

2

involved both a motion for summary judgment and a challenge to St. Clair's expert witness. The trial court sustained Alexander's objections to Barrash's testimony and granted Alexander's no-evidence motion for summary judgment.

## II. ALEXANDER'S OBJECTIONS

By sustaining Alexander's objections, the trial court effectively found that Barrash's testimony was not admissible for summary judgment purposes. In her third issue, St. Clair contends that Alexander did not properly challenge Barrash's testimony because Alexander did not offer contrary evidence disproving Barrash's methodology. Specifically, St. Clair argues that the trial court violated rule 702 by sustaining Alexander's objections. Based on St. Clair's underlying arguments, we construe her third issue as asserting that the trial court abused its discretion by sustaining Alexander's objections and excluding Barrash's testimony.

### A.      Standard of Review

Whether the trial court properly excluded expert testimony is subject to an abuse of discretion standard of review. *See Robinson*, 923 S.W2d at 558. The trial court abuses its discretion when its decision is arbitrary, unreasonable, or without regard to guiding rules and principles. *Larson v. Downing*, 197 S.W.3d 303, 304-05 (Tex. 2006); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

### B.      Applicable Law

The trial court sustained Alexander's objections that Barrash's testimony regarding the breach of the standard of care and causation was not admissible because it did not meet the requirements of rule 702. *See* TEX. R. EVID. 702. Expert testimony is admissible if: (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. *Robinson*, 923 S.W.2d at 556. It is the obligation of the trial court to act as "gatekeeper" to ensure relevance and reliability of expert testimony. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 722-26 (Tex. 1998). Once the party opposing expert testimony objects, the proponent bears the burden to demonstrate admissibility. *Robinson*, 923 S.W.2d at 557.

3

**C.     Analysis**

St. Clair argues that the trial court violated chapter 74 of the Texas Civil Practices and Remedies Code, as well as the *Daubert-Robinson* standard of review.   In his objections to Barrash's testimony, Alexander did not challenge Barrash's testimony on the basis that it was irrelevant.  Instead, Alexander only asserted that Barrash was unqualified to offer standard-of-care testimony and that his opinions regarding the standard of care and causation were not reliable.

*1. Barrash is a Qualified Expert*

Section 74.402 of the Texas Civil Practice and Remedies Code provides that:

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b) (Vernon 2005).

Barrash graduated from the University of Maryland School of Medicine in 1966. After completing his degree, he interned for one year at Mercy Hospital in Baltimore, Maryland.  In 1968, he began residency training in general surgery.  After completing his general surgery residency, he completed a residency in neurological surgery in 1972 at Baylor College of Medicine.  Following his residency, Barrash began his own practice, which he still maintains.  In 1974, he became board certified in Neurosurgery.  He is currently a member of the American Association of Neurological Surgeons, the Congress of Neurological Surgeons, the Texas Association of Neurological Surgeons, and the Houston Neurological Society.

4

At the time of St. Clair's surgery, Barrash was no longer able to perform laminectomies as a lead surgeon due to an injury sustained in his right arm. However, in his affidavit, Barrash states that despite his injury, he currently assists in laminectomies preoperatively, operatively, and postoperatively. Further, Barrash states, "I continue to assist in laminectomies to the present day and actively see patients who have undergone a laminectomy procedure on an almost daily basis."

Alexander argues that the trial court did not abuse its discretion in finding Barrash unqualified because Barrash does not meet the requirements of subsection (b)(1). Specifically, Alexander argues, "insofar as Barrash is no longer lead surgeon on the type of surgeries involved in this case, he is no longer practicing the type of health care being rendered by Alexander at the time of his treatment of Ms. St. Clair . . . ." Alexander supports this argument by emphasizing that "for the past ten years [Barrash] has just been a second opinion doctor," as opposed to a "lead surgeon."

In *Larson v. Downing*, the Texas Supreme Court concluded that the trial court properly excluded the testimony of the plaintiff's proffered expert where the expert had not performed the surgery at issue for over eleven years, and there was no evidence that he had ever taught the procedure. 197 S.W.3d at 305. The court noted that "[t]he trial court was well within its discretion in determining that [the plaintiff's expert] was too far removed from surgical procedures and even from teaching." *Id.* Unlike the proffered expert in *Larson*, where no evidence was presented that the expert continued to participate in surgery, Barrash continues to participate in lumbar laminectomy surgeries. Although Barrash is presently unable to hold the title of "lead" surgeon, he is nevertheless a surgeon who assists in laminectomies preoperatively, operatively, and postoperatively. Therefore, at the time of St. Clair's surgery, Barrash was "practicing health care in a field of practice that involves the same type of care or treatment" as that required of Alexander. TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1). By finding Barrash unqualified to render expert testimony as to the standard of care involved in laminectomies, the trial court abused its discretion.

5

*2. Barrash's Testimony is Reliable*

"Rule 702's reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions." *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). In reviewing the reliability of an expert's testimony, the court is not to determine whether the expert's conclusions are correct but "whether the analysis used to reach those conclusions is reliable." *Id.* Expert testimony involving scientific knowledge that is not grounded "'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.'" *Robinson*, 923 S.W.2d at 557 (quoting *Daubert*, 509 U.S. at 590); *see Merrell Dow Pharms, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (noting that an expert's "bare opinions will not suffice" and the "substance of the testimony must be considered"). Because there is nothing in the record to indicate the test the trial court used when determining the reliability of Barrash's testimony, we look to both the *Robinson* factors[3] and *Gamill* analytical gap analysis.[4] *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 579-80 (Tex. 2006).

St. Clair contends that the foundational data underlying Barrash's opinion is reliable because it is based on reliable scientific methodology. Differential diagnosis, the methodology used by Barrash, is a scientific process whereby a doctor identifies the cause of a medical problem by eliminating possible causes "by comparing the patient's symptoms to symptoms associated with known diseases, conducting physical examinations, collecting data on the patient's history and illness, and analyzing that data—until a final diagnosis for proper treatment is reached." *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d

---

[3] In *Robinson*, the supreme court set forth a non-exclusive list of six factors for determining reliability of expert testimony. *Robinson*, 923 S.W.2d 549 at 556. The factors include: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Id.*

[4] When an expert opinion is based on the experience of the expert alone, the trial court must determine if there is a sufficient connection between the existing data and the opinion offered or if there is "simply too great an analytical gap" for the expert testimony to be considered reliable. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

591, 604 (Tex. App.–Houston [1st Dist.] 2002, pet. denied). Generally, differential diagnosis is performed after conducting physical examinations, taking medical histories, and reviewing clinical tests. *Praytor v. Ford Motor Co.*, 97 S.W.3d 237, 245 (Tex. App.–Houston [14th Dist.] 2002, no pet.). Differential diagnosis then requires "determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Id.* Differential diagnosis "'has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results.'" *Id.* (quoting *Brown v. Se. Pa. Transp. Auth.* (*In re Paoli R.R. Yard PCB Litig.*), 35 F.3d 717, 758 (3d Cir. 1994)).

Barrash's affidavit sufficiently states the methodology he employed by listing the most likely causes of cauda equina syndrome and using St. Clair's postoperative radiographical studies to eliminate two of the potential causes. In his affidavit, Barrash states that based on his education, experience, and training, and after reviewing and taking into account St. Clair's medical history and treatment, there are three potential causes of St. Clair's cauda equina syndrome: (1) over-manipulation of the cauda equina nerves; (2) spinal stenosis; or (3) a postoperative hematoma. In conducting his investigation, Barrash reviewed St. Clair's medical records, including but not limited to medical records of St. Clair's previous surgeries, physical therapy records, records from Alexander, as well as multiple x-ray, imaging, and radiographic studies. The postoperative radiological studies negated the presence of spinal stenosis or a hematoma.[5] By negating two of the three

---

[5] The deposition of Barrash also indicates that spinal stenosis was not the cause of St. Clair's cauda equina:

Q.  Were you able to tell from the postoperative films that the severe spinal stenosis had been relieved?

A.  Apparently, it had.

Q.  All right. In other words the—the doctor went in to relieve a severe spinal stenosis and, radiographically at least, apparently he did?

A.  Apparently, the severe stenosis was relieved.

most likely causes, Barrash determined that over-manipulation of the cauda equina nerves caused St. Clair's cauda equina syndrome.

Alexander contends that he properly challenged Barrash's methodology by pointing out that: (1) Barrash could not support his opinions with any medical record; (2) Barrash could cite no medical literature to support his opinion; and (3) Barrash failed to address alternative causes of cauda equine syndrome. We cannot agree. In his affidavit, Barrash states that he reviewed St. Clair's medical records. Further, Barrash formulated his opinion that over-manipulation of the cauda equina nerves caused St. Clair's injury by reviewing her postoperative radiographic studies.

Alexander also argues that he properly challenged the methodology employed by Barrash by arguing that Barrash failed to rule out other causes of St. Clair's cauda equina syndrome. Specifically, Alexander contends that Barrash failed to address alternative causes of cauda equine syndrome, such as fragments, degenerative changes, or uncontrollable swelling; again, we cannot agree.

Alexander argues that both fragments and uncontrollable post-surgical swelling are possible causes of cauda equina syndrome. In his deposition, Barrash dismisses the likelihood of either being a cause:

> Q.  Have you ever read that retained disk fragments can contribute to cauda equina syndrome?
>
> A.  Well, obviously, they can.
>
> Q.  Have you read it?
>
> A.  Not that I recall.
>
> Q.  Are you telling me that with a decompression you should never have any type of swelling of the nerve roots?
>
> A.  I think that's a possibility.
>
> Q.  Is it a probability?
>
> A.  I think it's a possibility.
>
> Q.  But not a probability?
>
> A.  At what level? At what level are we talking about?

8

Q.   At L3 to S1?

A.   Probably it should be minimal; and if you're well decompressed, it doesn't matter.

Q.   Nevertheless, you can have swelling of the nerve roots with a standardly performed decompression?

A.   I guess that's a possibility.

Q.   Okay. At what point in time? Immediately when you wake up, or when swelling occurs 24 to 72 hours later?

A.   You have to qualify that for me. At what point in time?

Q.   All I can tell you is post-op.

A.   Well, you have to qualify because the swelling doesn't come instantly unless you bang a nerve. You've really got a bang a nerve. And if you really bang a nerve, that's not right. You don't do that. If it comes on 24 hours later—nerves take time to swell. The spinal cord takes time to swell.

You decompress the cervical area that's been very tightly compressed, and you can get a quadripareses from that, which is reversible from the swelling which doesn't come on when you wake up. It comes on 6, 8, 10, 12, 24, 48 hours later.

Swelling in the nervous system reaches it [sic] its maximum in two to days [sic], not in two to five minutes, unless there's a direct trauma to the nerve, to the cauda equina, to multiple nerves.

In light of the foregoing, St. Clair met her burden of establishing that Barrash utilized a scientifically reliable methodology. *See Robinson*, 923 S.W.2d at 557. We conclude Barrash was qualified and his testimony was reliable. Thus, the trial court abused its discretion by sustaining Alexander's objections to Barrash's expert opinion evidence. Accordingly, we sustain St. Clair's third issue as construed.

### III. NO-EVIDENCE SUMMARY JUDGMENT

In her first issue, St. Clair contends that the trial court erred by considering evidence attached by Alexander to his no-evidence motion for summary judgment. In her second issue, St. Clair contends that the trial court's consideration of the evidence attached to Alexander's no-evidence motion for summary judgment converts the motion to a traditional

motion for summary judgment, and thereby changes the standard of review from legal sufficiency to de novo.

## A.    Standards of Review

We review a trial court's ruling on a no-evidence motion for summary judgment for legal sufficiency. *Tamez*, 206 S.W.3d at 581-82; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex.2003). Accordingly, we review the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *City of Keller v. Wilson*, 168 S.W.3d 802, 825 (Tex. 2005) (noting that review of a "no-evidence" motion for summary judgment is effectively restricted to the evidence contrary to the motion); *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 772 (Tex. App.–Corpus Christi 2003, no pet.) (op. on rehr'g). The burden of producing evidence is entirely on the non-movant; the movant has no burden to attach any evidence to the motion. *See* TEX. R. CIV. P. 166a(i). Summary judgment is improper if the non-movant produces evidence to raise a genuine issue of material fact. *See id.* To raise a genuine issue of material fact, the non-movant must produce a scintilla of probative evidence. *Ortega*, 97 S.W.3d at 772. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion of a fact.'" *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). Conversely, more than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)). In determining whether the non-movant has produced more than a scintilla of evidence, we review the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Tamez*, 206 S.W.3d at 582; *City of Keller*, 168 S.W.3d at 827.

A traditional motion for summary judgment, on the other hand, is reviewed de novo. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex. App.–Corpus Christi 2003, no pet.) Upon review of a traditional summary judgment, we must determine whether the movant met its burden

to establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The movant bears the burden of proving that there is no genuine issue of material fact and that he is entitled to summary judgment at a matter of law. *See Sw. Elec. Power Co.*, 73 S.W.3d at 215. Any evidence favorable to the non-movant is taken as true, and any doubts are resolved in the non-movant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

## B.   Consideration Does Not Warrant Transformation

In *Binur v. Jacobo*, the Texas Supreme Court held that a movant's attachment of evidence to a single filing that combines a no-evidence motion for summary judgment with a traditional motion for summary judgment does not foreclose the movant from advancing no-evidence points. 135 S.W.3d 646, 651 (Tex. 2004). However, "if a motion brought solely under subsection (i) attaches evidence, that evidence should not be considered unless it creates a fact question, but such a motion should not be disregarded or treated as a motion under subsection (a) or (b)." *Id.*, *see* TEX. R. CIV. P. 166a(i) (regarding no-evidence motions for summary judgment); TEX. R. CIV. P. 166a(a), (b) (regarding traditional motions for summary judgment). In the present case, neither party disputes that the motion filed by Alexander is solely a no-evidence motion for summary judgment that raises a *Daubert-Robinson* challenge. St. Clair argues that the trial court considered Alexander's evidence by allowing Alexander to read aloud the evidence attached to his motion for summary judgment. St Clair further argues that such consideration was erroneous and transforms Alexander's no-evidence motion into a traditional motion.

St. Clair supports her transformation argument by citing *Breshears v. State Farm Lloyds*, an opinion decided by this Court three months after *Binur.* 155 S.W.3d 340 (Tex. App.–Corpus Christi 2004, pet. denied). In *Breshears*, an insurance contract dispute arose between Breshears and State Farm Lloyds. *Id.* at 341. Traditional motions for summary judgment were filed by both parties, and State Farm also filed a no-evidence motion for

11

summary judgment. *Id.* The trial court granted State Farm's motion for summary judgment without specifying whether the motion was granted on traditional or no-evidence grounds. We noted, "[b]ecause the trial court relied on evidence attached to the motions, we consider the traditional motion for summary judgment only." *Id.* at 342. By so stating, we did not hold that the no-evidence motion was converted into a traditional summary judgment; we merely advocated looking to surrounding circumstances in determining whether a traditional or no-evidence motion had been ruled upon. In *Breshears*, it was unclear whether the traditional or no-evidence had been ruled upon; therefore, we simply noted that, because we assume that the trial court knows not to consider evidence produced by the movant when ruling on a no-evidence motion, by process of elimination, the trial court must have ruled on the traditional motion.

The present case is distinguishable because it is clear that after sustaining Alexander's objections to Barrash's testimony, the trial court granted Alexander's motion for summary judgment on no-evidence grounds. Moreover, neither St. Clair nor Alexander dispute that only a no-evidence motion for summary judgment was filed. Because we find that the no-evidence motion for summary judgment has not been converted, we decline to review this case under a de novo standard. Accordingly, we overrule St. Clair's second issue.

## C.   Breach of the Standard of Care and Causation

In her first issue, St. Clair contends that the trial court erred by considering the portions of Barrash's testimony attached by Alexander. In order to prevail on her medical malpractice claim, St. Clair must establish that: (1) Alexander had a duty to comply with a specific standard of care; (2) Alexander breached that standard of care; (3) St. Clair was injured; and (4) there was a causal connection between the breach of the standard of care and the injury. *See Williams v. Huber*, 964 S.W.2d 84, 86 (Tex. App.–Houston 1997, no pet.). We construe this as arguing that there is enough evidence in the record to survive Alexander's motion for no-evidence summary judgment.

12

Alexander's no-evidence motion for summary judgment asserts that he is "entitled to summary judgment because there is no evidence of breach of the standard of care or causation to support [St. Clair]'s causes of action."[6] Even assuming the trial court erred in considering the evidence attached to Alexander's no-evidence motion for summary judgment, we conclude that St. Clair produced more than a scintilla of evidence concerning Alexander's breach of the standard of care and causation.

"In a negligence case, the applicable standard of care is a threshold issue that the plaintiff must establish before the factfinder can determine if the defendant deviated from the standard of care to a degree that constitutes negligence." *Cobb v. Dallas Fort Worth Med. Ctr.*, 48 S.W.3d 820, 825 (Tex.App.–Waco 2001, no pet.). In his affidavit, Barrash states:

> The standard of care when performing a decompressive laminectomy requires the surgeon to use proper technique and care of the nerves running along the lumber [sic] area. Specifically, the surgeon must not aggressively manipulate the nerves to the point that injury occurs. Because of the delicate nature of the nerves in this area, over manipulation of the nerves by the surgeon will lead to cauda equina syndrome . . . . If the nerves are handled properly and within the standard of care; that is, they are not over manipulated, a patient will not develop cauda equina syndrome in an otherwise successful procedure.

Barrash's affidavit then asserts that Alexander failed to meet the standard of care by using "excessive force to manipulate the nerves during the procedure." Such excessive force, he asserts, was the direct cause of St. Clair's cauda equina syndrome. Barrash's affidavit continues:

> In Ms. St. Clair's procedure, cauda equina syndrome could not have occurred absent negligence. A review of Ms. St. Clair's medical chart shows no other possible causes for Ms. St. Clair's cauda equina syndrome other

---

[6] Specifically, Alexander argues that Barrash's testimony is contradictory because: (1) "[a]t his deposition, Barrash admitted that he could identify no act during the surgery which violated the standard of care. However, in his affidavit, he asserts that Alexander used excessive force during the operation"; and (2) Barrash admitted in his deposition that there are several possible causes of cauda equina syndrome, but his affidavit lists only three. During his deposition, Barrash was asked if he could point to a page in St. Clair's operative or other medical record and "say this was a wrong thing to do." However, Barrash later testified that cauda equina syndrome would not occur unless a surgeon "really bang[s] a nerve," and that "if you really bang a nerve, that's not right." Moreover, although Barrash testified that there are several "possible" causes of cauda equina syndrome, his affidavit specifically states that "given [St. Clair's] medical history and treatment," there are only three possible causes. We therefore conclude that Alexander's assertion that Barrash's testimony is contradictory is unfounded.

13

than the over-manipulation of the cauda equina nerves during the procedure. The only other causes for Ms. St. Clair's cauda equina syndrome, given her medical history and treatment, would have been the spinal stenosis itself or a postoperative hematoma. No radiological studies taken postoperatively show the presence of a hematoma. Further, Ms. St. Clair's radiographic studies show that her spinal stenosis was relieved by the procedure. Therefore, in reasonable medical probability, Ms. St. Clair's cauda equina syndrome could only have been caused by over manipulation of her cauda equina nerves. This nerve injury, in turn, has caused Ms. St. Clair's severe bowel and bladder dysfunction, sexual dysfunction, as well as her diminished ability to use her left on the left side of her body.

Based on the foregoing evidence, we conclude that reasonable minds could differ as to whether Alexander manipulated St. Clair's nerves with excessive force; therefore, St. Clair's first issue, as construed, is sustained. *See Chapman*, 118 S.W.3d at 751; *Ortega*, 97 S.W.3d at 772.

## IV. CONCLUSION

We reverse the trial court's order granting Alexander's objections and summary judgment and remand for further proceedings consistent with this opinion.

ROGELIO VALDEZ,
Chief Justice

Memorandum Opinion delivered and
filed this the 30th day of September, 2009.